| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT** <br> **DISTRICT OF NEW JERSEY** <br> **Caption in Compliance with D.N.J. LBR 9004-2(c)** <br> Edmond M. George, Esquire <br> Obermayer Rebmann Maxwell & Hippel LLP <br> Woodland Falls Corporate Park <br> 200 Lake Drive East, Suite 110 <br> Cherry Hill, New Jersey 08002-1171 <br> (856) 795-3300 <br> *Special Counsel for Chapter 7 Trustee* | |
| **In re:** <br><br>        **LOCALBIZUSA, INC.,** <br><br>                        Debtor. | **Chapter 7** <br><br> **Case No. 09-20654 (GMB)** |
| **LOCALBIZUSA, INC.,** by and through **JOHN W. HARGRAVE,** Chapter 7 Trustee, <br><br>        Plaintiff, <br>    v. <br><br> **THOMAS J. FREUND,** an individual, <br>                and, <br><br> **PATRICK GIGLIO,** an individual, <br>                and, <br><br> **NORTH AMERICAN MARKETING TOURS, INC.,** a New Jersey Corporation, <br>                and, <br><br> **INTERNATIONAL CONSULTING AND MANAGEMENT GROUP, LLC,** a New Jersey Limited Liability Corporation, <br>                and, <br><br> **UNIQUE BILLING SOLUTIONS, LLC,** a New Jersey Limited Liability Corporation, <br>                and, <br><br> **JEFFREY ROSENBERG,** an individual, <br>                and, <br><br> **LOUIS FREEDMAN,** an individual, <br>                and, <br> **JOHN DOES 1-10,** individuals, <br><br>                Defendants. | **Adversary No.** <br><br><br> **COMPLAINT OF** <br> **THE CHAPTER 7 TRUSTEE** <br> **JOHN W. HARGRAVE** |

4824090

John Hargrave, the Chapter 7 Trustee (the "Trustee") of the estate of LocalBizUSA, Inc. (the "Debtor"), by and through his undersigned special counsel Obermayer Rebmann Maxwell & Hippel LLP, hereby complains of the defendants (collectively the "Defendants"), and each of them, as follows:

**I.     PARTIES**

1. The Trustee was appointed to act as a Trustee under § 701 of the Bankruptcy Code, and is vested with all of the Debtor's right, title and interest in its assets under § 704 of the Bankruptcy Code. The Trustee is the representative of the Debtor for all purposes under this Complaint.

2. The Debtor, a New Jersey Corporation organized under the laws of the State of New Jersey, was previously engaged in the providing of web creation services to customers, and billed through the customer's telephone number with certain Local Exchange Companies ("LEC's") who were generally the customer's telephone carriers.

3. Defendant North American Marketing Tours, Inc. ("NAMT") is, upon the Trustee's information and belief, an entity located in the State of New Jersey that provided telemarketing services to the Debtor. NAMT was also the Debtor's disbursing agent performing the disbursement function under the Debtor's confirmed Plan.

4. Defendant International Consulting and Management Group, LLC ("ICMG") is, upon the Trustee's information and belief, a New Jersey Limited Company that provided telemarketing services to the Debtor.

5. Defendant Unique Billing Services, Inc. ("UBS") is, upon the Trustee's information and belief, a New Jersey entity that provided collection services to the Debtor in

connection with the telemarketing services provided by NAMT and ICMG, and was responsible for processing payments to the Debtor trough the Debtor's customer's LEC's.

6. Defendant Thomas J. Freud ("Freud") was the CFO of the Debtor. Freund is a resident of New Jersey and was, upon information and belief a party in a confidential, trust and fiduciary position with respect to the Debtor and its creditors, in that Freund wrote checks, cleared obligations for payment and otherwise controlled the Debtor's accounts. Upon the Trustee's information and belief, Freund is a principal of both NAMT and ICMG and a person in control of the operations of NAMT and ICMG.

7. Defendant Patrick Giglio ("Giglio") was the president of the Debtor and the person in control of the Debtor's operations and finances at all relevant times.

8. Defendant Jeffrey Rosenberg ("Rosenberg") is, upon the Trustee's information and belief, a principal of UBS and a person in control of the operations of UBS.

9. Defendant Louis Freedman ("Freedman") is, upon the Trustee's information and belief, a principal of both NAMT and ICMG and a person in control of the operations of NAMT and ICMG.

10. John Does 1-10 are the other and unidentified principals of UBS, NAMT and ICMG, and are, upon information and belief, liable to and/or along with the other Defendants for the acts complained of in this Complaint.

## II.   JURISDICTION AND VENUE

11. This adversary proceeding is a core proceeding pursuant to § 157(b) of the Judicial Code, 28 U.S.C. § 157(b). This proceeding arises under § 549 of the Bankruptcy Code. 11 U.S.C. § 101, *et. seq.* (the "Code"), and this Court's pendent jurisdiction.

12. This Court has jurisdiction pursuant to § 157 and § 1334(b) of Title 28 of the United States Code, 28 U.S.C. §101 *et seq.*, and the General Order of Reference of United States District Court for the District of New Jersey.

13. This adversary proceeding arises in a case under the Bankruptcy Code pending in this District, and thus, venue properly lies within this District pursuant to § 1409(a) of the Judicial Code, 28 U.S.C. § 1409(a).

14. Pursuant to Federal Rule of Bankruptcy Procedure 7012(b) there are both core and non-core matters presented to this court in this verified complaint.

15. The Trustee consents to the entry of final judgments by the judges of this Court as to all counts and claims.

## III. FACTUAL PREDICATES UNDERLYING ALL CLAIMS

16. The Debtor's case was commenced on April 28, 2009 by the filing of an involuntary Chapter 7 proceeding by certain of the Debtor's creditors.

17. On May 21, 2009, the Debtor commenced a bankruptcy case by filing voluntary Chapter 11 petition under the Bankruptcy Code.

18. On or about June 15, 2009, the Court entered a consent order substantively consolidating the Debtor's proceedings.

19. On June 24, 2009, this Court entered an order converting the Debtor's case to one under Chapter 11.

20. Through a series of cash collateral orders, the Debtor was limited in its ability to spend money. In that regard, the cash collateral orders forbid the Debtor from paying expenses that were not critical to its operations, and limited payments to certain vendor creditors of the Debtor, including the Defendants herein.

21. While the limitations on use of cash collateral were in place during the Debtor's Chapter 11 case, expenses were managed and the Debtor was able to collect and maintain nearly Four Hundred Thousand dollars ($400,000.00) in cash balances.

22. In November 2009 the Debtor, UBS, ICMG and NAMT and certain creditors entered into a Settlement Agreement ("Settlement") pursuant to which the Debtor agreed to file a plan of reorganization encompassing the Settlement terms.

23. On April 14, 2010, the Debtor filed its Second Modified Plan of Reorganization ("Plan") a copy of which is attached hereto as Exhibit "A".

24. On June 3, 2010 the Bankruptcy Court entered an order confirming the Debtor's Plan.

25. Pursuant to Section II F.2. of the Plan, the Debtor agreed to limit certain expenses payable to vendors, including the Defendants herein. The limitations in the plan are identical to those contained in the Settlement.

26. At all relevant times, Rosenberg, Freund, Giglio, Freedman and NAMT were acting as fiduciaries with respect to the Debtor's operations.

27. The Plan is a contractual arrangement between the Debtor and its creditors and as a contract is enforceable on its terms.

28. The Plan also provided for the appointment of a disbursing agent, who was charged with effectuating the Plan and the Debtor proffered NAMT, who was appointed as the Debtor's disbursing agent. The Trustee is unaware of whether the role of disbursing agent was shared between NAMT and Freund.

29. The Debtor never completed the Plan obligations and the Debtor's case was converted by this Court by Order entered on October 9, 2012.

30. The Plan had required certain weekly and monthly reports of income and expenses to be provided to creditors.

31. In addition, the Plan incorporated a cap on the amount that could be paid to NAMT and ICMG. The Plan, by virtue of the integration of the Settlement Agreement, which integrated the terms in the Cash Collateral orders entered during the Chapter 11 case, only permitted payment to the extent that the payment was supported by contract between the Debtor and NAMT and ICMG.

32. Specifically, NAMT and ICMG would be required to present 750 new customers per week in order to earn the payment of Thirty Seven Thousand Five Hundred dollars ($37,500.00) per week which was provided as a Budgeted Expense in the Plan.

33. NAMT and ICMG never actually achieved these sales figures.

34. Throughout much of the Chapter 11 case, the Debtor continued to pay $37,500 per week to NAMT and ICMG without receiving the benefit of the Debtor's bargain.

35. The Trustee has determined that there were forty thousand six hundred and four (40,684) new customers during the relevant period.

36. At a contractual rate of Fifty dollars ($50.00) per new customer delivered by NAMT and ICMG, and based on the actual sales, NAMT and ICMG should have received no more than Two Million Thirty Four Thousand Two Hundred dollars ($2,034,200.00).

37. The Trustee has determined that NAMT and ICMG were paid Two Million Four Hundred Thousand dollars ($2,400,000.00), receiving an overpayment of Three Hundred Sixty Five Thousand Eight Hundred dollars ($365,800.00).

38. Under the Plan, UBS was to be paid a flat rate of Five dollars ($5.00) per customer billed or presented to the LEC through the billing houses.

39. The Trustee has determined that there was three hundred eleven thousand six hundred sixty five (311,665) billings during the relevant period.

40. UBS should have received One Million Five Hundred Fifty Eight Thousand Three Hundred Twenty Five dollars ($1,558,325.00) from the Debtor's estate.

41. UBS was in fact paid Two Million Forty Three Thousand Two Hundred dollars ($2,043,200.00), which reflects an overpayment of Four Hundred Eighty Four Thousand Eight Hundred Seventy Five dollars ($484,875.00).

42. The Plan provided for distribution to unsecured creditors based on the "Net Cash Flow" from the operations of the Debtor post-confirmation. "Net Cash Flow" was defined in the Plan as "all of the Debtor's Cash receipts from any source _less_ the Budgeted Expenses".

43. The "Budgeted Expenses" were defined as "expenses in the amounts and to the persons or parties set forth on Exhibit "A" of the Plan.

44. Exhibit "A" of the Plan provided for the weekly payment of $37,500 to NAMT/ICMG and the weekly payment of $22,500 to UBS.

45. The Plan provided that the Debtor specifically assumed all of its obligations under the Settlement Agreement and in the event of a conflict between the terms of the Plan and the terms of the Settlement Agreement, the terms of the Settlement Agreement would control.

46. There is a conflict between the terms of the Plan and the terms of the Settlement Agreement: the plan provides for unconditional payment of the Budgeted Expenses (including $37,500 per week to NAMT/ICMG and $22,500 per week to UBS) while the Settlement Agreement (by virtue of incorporating the terms of the cash collateral orders), only permits payment to NAMT/ICMG and UBS to the extent supported by a pre-petition contract.

47. Because the terms of the Settlement Agreement control, NAMT/ICMG and UBS were only entitled to be paid to the extent supported by their pre-petition contracts with the Debtor.

48. At all times relevant hereto, the Debtor was insolvent as that term is defined by the Bankruptcy Code and relevant case law of the applicable jurisdiction.

49. At all times relevant hereto, upon information and belief Giglio, Rosenberg, Freund, Freedman and potentially John Does 1-10 controlled the Debtor's finances, and controlled the Debtor's day to day business operations.

50. At all times relevant hereto, Giglio, Rosenberg, Freedman and Freund acted pursuant to a common agreement, scheme and plan to defraud the Debtor and its creditors by certain acts which were violative of both state and Federal law or alternatively acted in a reckless and cavalierly with respect to the Debtor's finances and the contractual and other duties running from UBS, NAMT and ICMG to the Debtor under the Plan and the agreements.

51. At all times relevant hereto, Giglio, Rosenberg, Freedman and Freund actively concealed the existence of the overpayments from the parties in interest.

52. At all times relevant hereto, Giglio, Rosenberg, Freedman, NAMT, ICMG, UBS and Freund were fiduciaries owing duties to the Debtor and its creditors under applicable law.

53. In connection with the common agreement and scheme the Defendants, and each of them, made material nondisclosures and actively concealed certain financial and other information from the Debtor's creditors which representations and nondisclosures gave the impression the Debtor was complying with the Plan when it was not.

54. These omissions were intentional, made with the intention of defrauding the Debtor and its creditors out of hundreds of thousands of dollars and did in fact result in the

improper removal of hundreds of thousands of dollars from the Debtor's estate without authority or consideration.

55. In connection with the common scheme, the Defendants, and each of them, failed to provide timely financial information to creditors in order conceal their violations of the Plan and Settlement.

56. As a consequence, the Defendants and each of them were responsible for the secretion and removal of over Eight Hundred Thousand dollars ($800,000.00) in cash from the Debtor's now defunct operations.

57. The Defendants breached the Plan by their actions all to the great detriment of the Debtor and its substantial creditors.

### Count I
### 11 U.S.C. §§ 549 and 550 OF THE BANKRUPTCY CODE
### Trustee v. NAMT, ICMG and UBS

58. The Trustee incorporates by reference the allegations in the foregoing paragraphs as if set forth fully herein and at length.

59. Following the filing of the Bankruptcy Petition, the Defendants received post-petition transfers (the "Post-petition Transfers") in the form of overpayments on contractual agreements between the Defendants and the Debtor.

60. Upon information and belief, the Post-petition Transfers were not authorized under Title 11 of the United States Code or by this Court, or disclosed to the parties in interest.

61. This Court confirmed the Plan, which had limitations on contractual payments to the Defendants UBS, NAMT and ICMG.

62. Defendant UBS was overpaid on its contract and under the Plan the sum of at least Four Hundred Eighty Four Thousand Eight Hundred Seventy Five dollars ($484,875.00).

63. Defendants NAMT and ICMG received overpayments from the debtor of Three Hundred Sixty Five Thousand Eight Hundred dollars ($365,800.00).

64. The Debtor overpaid the Defendants UBS, NAMT and ICMG collectively on their asserted contractual obligations by approximately Eight Hundred Thousand dollars ($800,000.00) (collectively the "Post-Petition Transfers").

65. The Post-Petition Transfers are property of the Debtor's estate and consequently its creditors.

66. The Post-Petition Transfers were intended for distributions to creditors and had the effect of improperly reducing the Debtor's net cash flows and hence money for the Debtor's unsecured creditors.

67. By reason of the foregoing, the Trustee may avoid the Post-petition Transfers and recover the Post-petition Transfers pursuant to Sections 549 and 550 of the Bankruptcy Code.

WHEREFORE, the Trustee prays for entry of judgment in the Debtor's favor and against the Defendants: (a) declaring and decreeing that the Post-petition Transfers are voidable and recoverable pursuant to Sections 549 and 550 of the Bankruptcy Code; (b) directing and ordering Defendants to return to the Trustee all the Post-petition Transfers; and (c) providing such other and further relief as this Court may deem just and proper.

### Count II
### CONSPIRACY
### Trustee  v. All Defendants

68. The Trustee incorporates by reference the allegations in the foregoing paragraphs as if set forth fully herein and at length.

69. The Defendants and each of them acted pursuant to a secret agreement and plan to defraud the Debtor and its creditors by removing revenues to which they were not entitled.

70. As a result of this conspiracy, the Debtor paid more than it was obligated to pay to NAMT, ICMG and UBS and failed to pay its creditors the moneys to which they were entitled under the Debtor's confirmed Plan.

71. As a result of the conspiracy, the Debtor defaulted on its obligations under the Plan and the Settlement Agreement.

72. As a result of the conspiracy, the Debtor was forced to abandon its Plan and convert its case to one under Chapter 7, leaving its creditors with hundreds of thousands of dollars in unpaid debt.

WHEREFORE, the Trustee prays this Court enters an Order granting judgment in the Debtor's favor and against the Defendants, and each of them, and providing such other and further relief as the court deems just and equitable.

**Count III**
**BREACH OF FIDUCIARY DUTIES**
**Trustee v. NAMT, Rosenberg, Giglio Freedman and Freund**

73. The Trustee incorporates by reference the allegations in the foregoing paragraphs as if set forth fully herein and at length.

74. As a fiduciary to the Debtor, NAMT as disbursing Agent stood in a close and confidential relationship with the Debtor and its creditors.

75. Rosenberg was in control of NAMT, and as such, he too owed fiduciary duties to the creditors of the Debtor, including the duty of loyalty.

76. As the president of the Debtor, Giglio had fiduciary duties to the Debtor including the duty of loyalty and fidelity and a duty to ensure the Debtor's assets were not squandered or misused.

77. As the person in control of the Debtor's bank accounts, Freund had a fiduciary duty to ensure that persons or entities were not being overpaid by the Debtor.

78. The Defendants, and each of them breached their respective fiduciary duties by authorizing, condoning, failing to prevent or actually making the unlawful transfers of moneys to the Defendants NAMT, ICMG and UBS, and by concealing same from creditors.

79. As a result of the breaches of fiduciary duties owed to the Debtor by Defendants, the Debtor was injured in its business, as assets were diverted and dissipated by NAMT, ICMG UBS, and their respective principals.

80. The Individual Defendants aided and abetted NAMT in secreting property from the Debtor by allowing the transfer of the Debtor's property to the other Defendants or concealing same from creditors.

WHEREFORE, the Trustee prays this Court enters an order granting judgment in the Debtor's favor and against the Defendants, and each of them, and providing such other and further relief as the court deems just and equitable.

## Count IV
## RECOVERY UNDER NEW JERSEY FRAUDULENT CONVEYANCE STATUTE
## Trustee v. NAMT, ICMG and UBS

81. The Trustee incorporates by reference the allegations in the foregoing paragraphs as if set forth fully herein and at length.

82. Pursuant to the New Jersey Fraudulent Transfer Act. N.J.S.A. § 25:2-25 *et seq.*, provides in relevant part,:

> a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> b. without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

    1. was engaged or was about to engage in a business or a transaction for which remaining assets of the debtor were unreasonably small in relation to the business or transaction.

N.J.S.A. § 25:2-25.

83. At numerous times during the relevant period NAMT, ICMG and UBS received payments (the "Payments") from the Debtor for which the Debtor received little or no consideration.

84. The Payments constitute transfers as that term is defined by applicable state law.

85. The Debtor made the Payments to NAMT, ICMG and UBS with actual intent to hinder, delay or defraud the creditors of the Debtor.

86. Moreover, the Payments to NAMT, ICMG and UBS were made at a time when the Debtor was insolvent or rendered insolvent by the Payments.

87. Further indication of the Defendants' fraudulent intent is that prior to the Payments various other creditors were not being paid and were asserting significant claims against the Debtor's estate and therefore were constructively fraudulent.

88. Furthermore, upon information and belief, the Payments were not disclosed to the Debtor's creditors when they occurred and reporting of the payments was substantially delayed so that creditors could not timely react.

WHEREFORE, the Trustee respectfully requests that this Court enters judgment in the Debtor's favor and against Defendants setting aside the fraudulent Payments in violation of the actual fraud provisions of the New Jersey Fraudulent Transfer Act. N.J.S.A. § 25:2-25 *et. seq.* and providing such other and further relief as this Court deems necessary and just.

### Count V
### COMMON LAW FRAUD
### Trustee v. All Defendants

89. The Trustee incorporates by reference the allegations in the foregoing paragraphs as if set forth fully and at length.

90. Defendants were acting as fiduciaries and therefore were charged with the highest degree of loyalty and trustworthiness.

91. Defendants knew or should have known that wrongfully diverting $800,000.00 of Debtor funds would injure the Debtor and its creditors.

92. Defendants knew or should have known that failing to issue reports or financial statements would injure Debtor and its creditors.

93. Upon information and belief, the Debtor and its creditors justifiably relied upon the Defendants to act with the highest duties with respect to the Debtor's funds and to use them only in accordance with Plan confirmed by the Bankruptcy Court.

94. Defendants knew or should have known that their actions and misrepresentations would force Debtor to be unable to pay its debts as they became due.

95. Defendants' general and overall breaches of their fiduciary duties and misrepresentations defrauded Debtor and its creditors out of thousands of dollars.

96. The Debtor and its creditors suffered damages not limited to the moneys improperly removed from the Debtor's estate.

WHEREFORE, the Trustee prays this Court enters an order granting judgment in the Debtor's favor and against the Defendants, and each of them, and providing such other and further relief as the Court deems just and equitable.

## Count VI
## BREACH OF CONTRACT
## Trustee v. NAMT, ICMG and UBS

97. The Trustee incorporates by reference the allegations in the foregoing paragraphs as if set forth fully and at length.

98. The Debtor had agreements with NAMT, ICMG and UBS the terms of which were set forth in the Plan and Settlement Agreement attached hereto as Exhibits "A" and "B" hereto.

99. NAMT, ICMG and UBS breached their agreements with the Debtor by charging amounts in excess of that which they agreed to accept under the Settlement Agreement and Plan.

100. The Debtor was damaged by the Defendants' breaches to the extent of approximately Eight Hundred Thousand dollars ($800,000.00), principally in the form of overpayments to the Defendants.

101. The Debtor and its creditors have been injured by the Defendants' breaches of their respective contracts, and the Plan, to the extent of Eight Hundred Thousand dollars ($800,000.00).

WHEREFORE, the Trustee prays this Court enters an order granting judgment in the Debtor's favor and against the Defendants, and each of them, and providing such other and further relief as the Court deems just and equitable.

Dated: May 6, 2014        By: __/s/ Edmond M. George__
                                         Edmond M. George, Esquire (EG-7810)
                                         OBERMAYER REBMANN MAXWELL & HIPPEL LLP
                                         Woodland Falls Corporate Park
                                         200 Lake Drive East, Suite 110
                                         Cherry Hill, NJ 08002
                                         *Special Counsel for John Hargrave,*
                                           *Chapter 7 Trustee of LocalBizUSA, Inc.*