NOT FOR PUBLICATION

FILED
JAMES J. WALDRON, CLERK

NOV 07 2016

U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY _____ DEPUTY

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW JERSEY

----------------------------------------------------------X

In Re:

LOCALBIZUSA, INC.,

             Debtor.

----------------------------------------------------------X

LOCALBIZUSA, INC., by and through JOHN
    W. HARGRAVE, Chapter 7 Trustee,

             Plaintiff,

v.

THOMAS J. FREUND, et al.,

             Defendants.

----------------------------------------------------------X

CASE NO. 09-20654 (JNP)

CHAPTER 7

ADV. NO. 14-1454 (JNP)

JUDGE: JERROLD N. POSLUSNY, JR.

## OPINION

**APPEARANCES:**

Edmond M. George, Esq.
Obermayer, Rebmann, Maxwell & Hippel LLP
200 Lake Drive East, Suite 110
Cherry Hill, NJ 08002
*Attorney for Plaintiff John W. Hargrave, Chapter 7 Trustee*

Christopher J. Stanchina, Esq.
Christopher J. Stanchina, Esq., LLC
222 New Road, Suite 206
Linwood, NJ 08221
*Attorney for Defendant Thomas J. Freund*

Francis J. Ballak, Esq.
Goldenberg, Mackler, Sayegh, Mintz, Pfeffer, Bonchi & Gill
666 New Road, Suite 1-A
Northfield, NJ 08225
*Attorney for Defendant Louis Freedman*

Chryssa Yaccarino, Esq.
Kelly & Brennan, P.C.
1011 Highway 71, Suite 200
Spring Lake, NJ 07762
*Attorney for Defendants Jeffrey Rosenberg & Unique Billing Solutions, LLC*

**JERROLD N. POSLUSNY, JR., U.S. Bankruptcy Judge**

## INTRODUCTION

Before the Court are the following motions: (1) the Trustee's Motion to Further Amend

Complaint and for Related Relief (the "Motion to Further Amend"); (2) Thomas J. Freund's

Motion to Dismiss Pursuant to the Affidavit of Merit Statute (the "Motion to Dismiss"); and

(3) the Trustee's Motion for Entry of Default Judgment against NAMT (the "Motion for

Default"). For the reasons detailed below, all three Motions are DENIED.

## FACTS & BACKGROUND

Creditors filed an involuntary Chapter 7 petition against LocalBizUSA, Inc. (the

"Debtor") in Camden, New Jersey on April 28, 2009. The Debtor filed a voluntary Chapter 11

petition in Newark, New Jersey about one month later. The cases were eventually consolidated

into one Chapter 11 case in Camden.

In November 2009, the Debtor entered into a Settlement Agreement with multiple

creditors. Three of these creditors ultimately became defendants in this matter: Unique Billing

Solutions LLC ("UBS"), North American Marketing Tours, Inc. ("NAMT"), and Intermediate

Consulting and Management Group LLC ("ICMG") (collectively, the "Corporate Defendants").

The relevant principals of these entities are: (1) Patrick Giglio, the Debtor's president; (2) Jeffrey

Rosenberg, a principal of UBS; (3) Louis Freedman, a principal of both NAMT and ICMG; (4)

Frank Cahill, a principal of UBS; and (5) Freund, the CFO of the Debtor and a principal of both

2

NAMT and ICMG (Cahill, Freedman, Freund, Giglio, and Rosenberg, collectively, the "Individual Defendants").

A plan of reorganization (the "Plan") that incorporated the Settlement Agreement was eventually confirmed. Under the Plan, the Debtor assumed all of its obligations under the Settlement Agreement and "in the event of a conflict between the terms of [the] Plan and the terms of the Settlement Agreement, the terms of the Settlement Agreement shall control." The Disbursing Agent under the plan was NAMT—a role in which Freund was involved by virtue of being the CFO of NAMT (collectively, the "Disbursing Agents"). The Debtor did not complete its Plan obligations and the case was converted to Chapter 7 on October 9, 2012.

The issues before the Court stem from alleged overpayments made under the Plan by the Disbursing Agents to the Corporate Defendants. The Plan required the Corporate Defendants to continue to attract a specific amount of new customers to the Debtor each week, and in return the Corporate Defendants would receive weekly payments from the Disbursing Agent (funded by the Debtor). The payments were made pursuant to Section 3.1 of the Settlement Agreement, which provides:

> [The Debtor] shall remain unconditionally liable to pay the Budgeted Expenses, including without limitation to [NAMT/ICMG] weekly in the amount of $37,500 and to UBS weekly in the amount of $22,500 in accordance with the Cash Collateral Orders and under their respective marketing, sales, and/or service contracts.

Because the Debtor was "unconditionally liable," the Disbursing Agents made these weekly payments regardless of whether the Corporate Defendants were meeting their customer quotas. The Trustee asserts that the Settlement Agreement, when read in conjunction with prior cash collateral orders that were incorporated into the Settlement Agreement, only permitted payment to the Corporate Defendants to the extent they reached their customer quotas.

The Trustee avers that the Corporate Defendants failed to meet their quotas. The Trustee calculates that total amount paid to ICMG and NAMT was approximately $2,400,000 and the total amount paid to UBS was approximately $2,000,000. Based on the approximate number of customers presented, the Trustee calculates that NAMT and ICMG were overpaid by approximately $365,000 and UBS was overpaid by approximately $485,000.

On May 6, 2014, the Trustee filed the Complaint asserting that the Defendants either conspired to defraud the Debtor and its creditors or, alternatively, breached their contractual or fiduciary duties by making and concealing overpayments. The Trustee's general arguments were that the Defendants were fiduciaries at all relevant times, the Debtor was insolvent at all relevant times, and the Defendants actively concealed the existence of the alleged overpayments from parties in interest by failing to file required financial reports. The six counts alleged in the original Complaint were as follows: (Count I) Recovery of Post-petition Transfers under § 549 of the Bankruptcy Code; (Count II) Conspiracy; (Count III) Breach of Fiduciary Duty; (Count IV) Fraudulent Conveyance Under New Jersey's Fraudulent Transfer Act, N.J.S.A. 25:2-25; (Count V) Common Law Fraud; and (Count VI) Breach of Contract.

After Freund moved to dismiss the Complaint, then-Chief Judge Gloria Burns directed the Trustee to re-plead the conspiracy and fraud counts. After one brief extension of time, the Trustee filed an Amended Complaint that included the following Counts: (Count I) Conspiracy against all Defendants; (Count II) Breach of Fiduciary Duties against NAMT, Cahill, Rosenberg, Giglio, Freedman and Freund; (Count III) Recovery under the New Jersey Fraudulent Conveyance Statute against NAMT, ICMG, and UBS; (Count IV) Common Law Fraud against all Defendants; (Count V) Breach of Contract against NAMT, ICMG, and UBS; and, finally, (Count VI) Negligence against NAMT and Freund.

Freund, Freedman, UBS, and Rosenberg filed motions to dismiss the First Amended

Complaint and Judge Burns issued a written decision[1] on May 14, 2015 which was followed by

an order dismissing Counts I, III, and IV entirely and dismissing Count II with respect to all

Defendants except NAMT and Freund.  After the Court's order, the remaining Counts were:

(Count II) Breach of Fiduciary Duty against NAMT and Freund; (Count V) Breach of Contract

against NAMT, ICMG, and UBS; and (Count VI) Negligence against NAMT and Freund.

The Trustee appealed.  The District Court remanded the case because the Bankruptcy

Court did not explain why giving the Trustee leave to amend the Amended Complaint would be

futile.  Upon remand, the Trustee filed the Motion to Further Amend along with a Second

Amended Complaint, which includes an additional Defendant, Frank Cahill, as well as new facts

and counts.  The Second Amended Complaint asserts: (Count I) Conspiracy against all

Defendants; (Count II) Breach of Fiduciary Duties against NAMT, Cahill, Rosenberg, Giglio,

Freedman, and Freund; (Count III) Recovery Under the New Jersey Fraudulent Conveyance

Statue, N.J.S.A. 25:2-25, et seq., against NAMT, ICMG, and UBS; (Count IV) Common Law

Fraud against all Defendants; (Count V) Breach of Contract against NAMT, ICMG, and UBS;

(Count VI) Negligence against NAMT and Freund; (Count VII) Conversion against all

Defendants except Gigilio; (Count VIII) Piercing the Corporate Veil against NAMT, UBS, and

ICMG; and (Count IX) Racketeering Influence and Corrupt Organizations ("RICO") violations

under 18 U.S.C. § 1961, against all Defendants.

Many of the factual amendments contained in the Second Amended Complaint—similar

to the previous versions of the Complaint—are mere conclusions, such as "the Individual

Defendants collectively fomented an alleged ambiguity in order to attempt to find some legal

justification for their gouging the Debtor and removing all of its revenue." See Proposed Second

---

[1] This Opinion incorporates Judge Burns' Opinion to the extent any relevant facts or legal
conclusions are not specifically mentioned in this Opinion.

Amended Complaint (the "Second Amended Complaint") attached to the Motion to Further

Amend as <u>Ex</u>. "D" ¶ 70.  Again, the Trustee avers that the Individual Defendants intentionally

delayed filing required reports in order to conceal facts from the Debtor's creditors.

That said, the Trustee has alleged relevant new facts.  For example, the Trustee has

alleged that Cahill and Giglio were signatories on the Debtor's bank accounts and that ICMG

was the owner of one of the Debtor's escrow accounts.

The Trustee provided more details regarding deficient quarterly summary reports filed by

the Debtor from April 2010 through December 2011, noting that supporting financial documents

were not attached to some of these reports.  The Trustee added that no reports were provided

from January 2012 through the date of conversion in October 2012.  During this time, John

Kaskey, who represents other creditors in the case, began directly contacting Freund regarding

missing and deficient reports.  Freund apparently explained that he had not "gotten around to"

filing the reports, and the Trustee alleges the factual conclusion that this was a lie designed to

conceal the fact that Freund was intentionally withholding information to unjustly enrich the

Defendants.  <u>See</u> Second Amended Complaint ¶¶ 113-19.

The Trustee avers that the Defendants consulted legal counsel regarding the interpretation

of the Settlement Agreement and Plan but, despite knowing of a potential issue, never brought

the issue to the Bankruptcy Court.  Though no basis is provided for these assertions, the Trustee

concludes that the Defendants were consulting with counsel in order to preemptively develop

legal defenses for their actions because they knew they were violating the Plan.

The Trustee added that multiple outside parties had been seeking money from the Debtor,

particularly state attorneys general that were suing the Debtor for "cramming activities," and that

the creditors in this bankruptcy case were unaware of these law suits. The Trustee defines

"cramming" as "a common name for a fraudulent scheme of placing a fictitious, overpriced, or

unauthorized claim for services onto an unsuspecting customer." Second Amended Complaint
¶ 173.

Many of the new factual allegations involve Giglio. According to the Trustee, unpaid
third parties were directed to communicate with Gigilio when Cahill and Rosenberg would fail to
return phone calls about unpaid debts to the Debtor's customers. Giglio allegedly suggested to
Cahill and Rosenberg that customers be moved from the Debtor to "MMS"—an entity which the
Trustee alleges absorbed the Debtor's business functions.

The most noteworthy of the factual allegations involving Giglio stem from conversations
recorded by a salesperson, Hobbes Soto, who reached out to Giglio because he was "frustrated
by nonpayment from [the Debtor]." Second Amended Complaint ¶ 164. According to the
Trustee, in these conversations, Giglio apparently explained to Soto how the Debtor was shifting
from telephone services to utility services, but that similar regulatory issues were arising in the
process. Gigilio admitted that the aforementioned law suits had been going on for years, though,
as the Trustee notes, these claims were not listed in the Debtor's schedules or otherwise
disclosed in the Debtor's bankruptcy. The Trustee quotes Giglio explaining how they had to
vigorously fight the various law suits because the Debtor faced the potential of being "shut
down." See Second Amended Complaint ¶ 159. The Trustee also quotes Giglio explaining how
"slick" Cahill is without providing any context. Id.

The Trustee adds that at one point Soto complained that Cahill and Rosenberg were
"running away from investors and creditors on that LocalBiz thing and doing the shenanigans
they did in order to make sure they got paid," to which Giglio stated, "I was in the middle of . . .
that whole thing getting them out of that." Second Amended Complaint ¶ 165.

From the recordings, it appears that Giglio admitted the Debtor was involved in
cramming. Giglio explained to Soto a scheme in which the company can get away with

overcharging some of their customers, because they never look at, or do not pay close attention

to, their bills. Giglio stated, "you are going to have quite a few customers that forget and just

pay their electric bill every month and never think of anything and just – you get paid forever on

that . . . ." Second Amended Complaint ¶ 171. Despite these admissions and the existence of

various law suits regarding cramming, the Debtor did not divulge any of this information in its

bankruptcy case. The Trustee avers that had creditors known of these undisclosed claims and

investigations, they likely would have sought the appointment of a trustee or stopped the

Individual Defendants from controlling the Debtor's finances. Thus, the Trustee argues, the

Individual Defendants concealed this information so that they could continue their alleged

scheme of intentionally misinterpreting the Plan and Settlement Agreement and overpay

themselves under the Plan.

The Trustee maintains that the Corporate Defendants were no longer in operation by

2012, based in part off of Giglio's recorded statement that "all of those billing houses [are]

done," and avers that the Defendants intentionally concealed that information from creditors.

The Trustee takes multiple quotes from one of Giglio's conversations with Soto in order to

illustrate this point. The Trustee notes that at one point Giglio stated:

> Kaskey has an idea what's going on about that is [sic] nothing
> really that he can put together that matches up. You got him where
> he wanted to be. Now – he's trying to do something that's not
> really going to work that way because there's way too many
> people on the other side that are saying, [']Hey, listen. I heard, and
> I know what I know.[']

Ex. E to Second Amended Complaint at 59-60. The Trustee argues that Giglio admits in the

recordings that companies such as UBS were no longer doing telemarketing or customer

relations.

In the same conversation, Soto asked Giglio what services UBS was currently providing. Giglio explained that UBS did not sell anything anymore, that they were "making sure that whatever customers are out there stay on them," and that they were getting paid $22,500 "to keep the customer going and to make sure the billing was going through." Ex. E to Second Amended Complaint at 60-61. Giglio continued to explain that Kaskey and the Trustee were arguing UBS should be getting paid significantly less, and that "everybody is still trying to, you know, jockey and get money, more money than they're supposed to get." Ex. E to Second Amended Complaint at 69. Soto responded by asking how the Trustee could "jockey," given that "[t]he numbers are set," to which Giglio answered, "[k]ind of. Depends on how you – depends on how you read the contract." Id.

Giglio then explained how, even if Kaskey and the Trustee managed to have the case converted to Chapter 7, "the worst thing that can happen" is that the Debtor's limited remaining assets would go to secured creditors first, and the only secured creditors are Rosenberg's and Freedman's companies. Id. The Trustee argues that Giglio's next statements are the most telling. Giglio explained to Soto how he "set up" the UCC-1 filings that were filed in February 2008 and gave UBS, NAMT, and ICMG their secured interests. Id. He explained that Kaskey was "go[ing] after" him, and that he showed up with the UCC-1 filings. Soto stated, "[i]t's funny how they fell out of thin air." Giglio responded, "[l]ast minute. Everybody forgot." Soto then stated, "[y]ou mean those UCC filings? These blank ones here? Fill them out real quick, we'll date them later." Giglio responded, "[y]es. Everything else is – is written in blue and dates are written in black. Did I say that out loud?" Based on this conversation, the Trustee avers that the UCC-1 filings were a fraud on creditors—that these allegedly falsified documents gave the Corporate Defendants liens years after the Debtor's obligations were incurred and allowed the Defendants to protect themselves should the case convert.

9

The Trustee also asserts that Giglio sent falsified documents to his litigation counsel and, after getting cold feet about the legality of his actions, the other Defendants agreed to pay him over a million dollars in salary so that he would cooperate. It is unclear what these documents were or the basis for the Trustee's allegations.

Finally, the Trustee asserts that "upon information and belief," the Defendants overstated to the Trustee the number of customers the Debtor had, and drained the assets of their companies by way of excessive and unjustified personal and entertainment expenses, and continued to do so after the Plan was confirmed. Accordingly, the Trustee believes the Corporate Defendants are merely shell entities as part of the Defendants' alleged scheme.

Freedman, Freund, Rosenberg, and UBS filed oppositions to the Trustee's request for leave to further amend the Complaint. In addition to his opposition to the Trustee's Motion, Freund seeks to dismiss the Complaint for failure to comply with New Jersey's Affidavit of Merit ("AOM") Statute. The Trustee filed an omnibus response to all of these pleadings and, in addition to seeking leave to further amend the Complaint, the Trustee has requested that default judgment be entered against NAMT, which has failed to file an Answer or otherwise respond in this matter.

## DISCUSSION

### A. The Trustee's Motion to Further Amend

With the exception of the Breach of Fiduciary Duty Count against Freund and NAMT, the Negligence Count, and the Breach of Contract Count, the Trustee's previous version of the Complaint was dismissed for failure to meet the plausibility requirement for pleadings of Fed. R. Civ. P. 12(b)(6), made applicable by Fed. R. Bankr. P. 7012, and the fraud-based claims failed to meet the heightened particularity requirement. This was primarily because the Complaint failed

to allege sufficient facts to support these claims and consisted of predominantly legal

conclusions rather than factual support. A plaintiff cannot support its causes of action with mere

conclusory statements. Ashcroft v. Iqbal, 556 U.S. 662 (2009).

The Trustee now seeks to amend the Complaint and has filed the Second Amended

Complaint. Pursuant to Fed. R. Civ. P. 15(a)(2), made applicable by Fed. R. Bankr. P. 7015,

leave to amend should be given "freely . . . when justice so requires." A court is limited in

granting leave to amend only when: there is undue delay, bad faith, or dilatory motives; the

amendment would be futile; or the amendment would prejudice the other parties. Fraser v.

Nationwide Mut. Ins. Co., 352 F3d 107, 116 (3d Cir. 2003). An amendment to a complaint is

futile "if the amendment will not cure the deficiency in the original complaint or if the amended

complaint cannot withstand a renewed motion to dismiss." Maiden Creek Associates, L.P. v.

United States Dept. of Transportation, 123 F. Supp. 3d 638, 653 (E.D. Pa. 2015) (citing

Jablonski v. Pan Am. World Airways, Inc., 863 F.2d 289, 292 (3d Cir. 1988)).

Though only Freund, Freedman, Rosenberg, and UBS filed oppositions to the Trustee's

Motion to Further Amend, the Court will consider whether the Motion should be granted as to all

of the Defendants.

**1. New Jersey Fraudulent Transfer Act (Count III) and Common Law Fraud (Count IV)**

Under New Jersey law, to prevail on a claim of common law fraud, a Plaintiff must show:

(1) a material misrepresentation, (2) with knowledge of its falsity, (3) made with intent to induce

reliance, and (4) reliance on the representation by the defrauded party. In re ORFA Securities

Litigation, 654 F. Supp. 1449, 1461 (D.N.J. 1987) (citing Enright v. Lubow, 202 N.J. Super. 58,

493 A.2d 1288 (App. Div. 1985)). Fraud-based claims are held to a heightened particularly

standard under Fed. R. Civ. P. 9(b). In re Rockefeller Center Properties, Inc. Securities

Litigation, 311 F.3d 198, 216 (3d Cir. 2002). "Although Rule 9(b) falls short of requiring every

material detail of the fraud such as date, location, and time, plaintiffs must use alternative means

of injecting precision and some measure of substantiation into their allegations of fraud." Id.

(citation omitted).

   The New Jersey Fraudulent Transfer Act ("NJFTA"), provides in pertinent part, that:

> [A] transfer made . . . by a debtor is fraudulent as to a creditor . . .
> if the debtor made the transfer . . . without receiving reasonably
> equivalent value in exchange for the transfer . . . and the debtor . . .
> was engaged or was about to engage in a business or transaction
> for which remaining assets of the debtor were unreasonably small
> in relation to the business or transaction.

N.J.S.A. 25:2-25. The act is designed "to prevent a debtor from placing his or her property

beyond a creditor's reach" and "deliberately cheat a creditor by removing his property from the

jaws of execution." Gilchinsky v. Nat'l Westminster Bank N.J., 159 N.J. 463, 474, 732 A.2d

482, 488 (1999) (quotes omitted). Two elements must be proven under NJFTA: (1) the debtor

"put some asset beyond the reach of creditors which would have been available to them . . . but

for the conveyance," and (2) the transfer was made with intent to hinder, delay, or defraud the

creditor(s). Gilchinsky, 159 N.J. at 474, 732 A.2d at 488 (citation omitted). In deciding whether

the latter, intent element is present, New Jersey Courts use the "badges of fraud" for guidance.

159 N.J. at 476, 732 A.2d at 489. Those most relevant to the present Motion to Further Amend

include: the transfer was to an insider; the transfer was concealed; the debtor retained control of

the property after the transfer; the value of consideration received was not reasonably equivalent

to the value transferred; and the transfer was for substantially all of the Debtor's assets. 159 N.J.

at 476, 732 A.2d at 489; N.J.S.A. 25:2-26. When considering whether intent to defraud exists,

the court must balance the badges of fraud along with any other factors relevant to the transfer at

issue. Gilchinsky, 159 N.J. at 476, 732 A.2d at 489.

12

The Trustee predominantly utilizes legal conclusions in support of his fraud-based claims. The Trustee reasons that some of the Individual Defendants had control over the Debtor's finances and Freund intentionally delayed providing reports—which were not entirely accurate—because the Defendants had a secret agreement to defraud creditors.

The recordings of Giglio are the main new factual allegations in the Second Amended Complaint. These recordings still do not implicate fraud. First, other than mentioning that payments were being made to some of the Individual Defendants, Giglio never implies that the Defendants were scheming together. The Trustee did quote Giglio explaining the alleged cramming scheme, but, as discussed below, that scheme is unrelated to the initial Complaint and the issue of whether overpayments were made to creditors under the Plan. Any potential cramming scheme involved defrauding customers pre-bankruptcy, not creditors in the bankruptcy case. The Trustee tries to bridge the two by arguing that the alleged bankruptcy fraud was designed to conceal the alleged cramming fraud, but this is an unsupported legal conclusion. Giglio's statement about the Defendants' UCC-1 filings is troubling, but by itself it does not support a claim that the entire Plan and Settlement Agreement were the result of a fraudulent scheme by all of the Defendants—especially given that only Giglio is implicated by that statement.

Moreover, the fact that some of the Defendants had control over the Debtor's finances is insufficient to implicate fraud. The Trustee quotes Giglio in an attempt to show that Giglio admitted that the Corporate defendants did not provide any services to the Debtor and that he was trying to dodge Kaskey and other creditors. However, the Trustee omits that, in that same conversation, Giglio explained to Soto that UBS's service was to ensure the Debtor retained customers, and UBS was paid for this service. Giglio admitted that the Trustee and Kaskey were claiming he overpaid UBS, and he opined that the Trustee and Kaskey were trying to get money

13

they did not deserve. Giglio explicitly stated that whether the payments were accurate "depends on how you read the contract," clearly in reference to the Plan and Settlement Agreement. This solidifies that the issue before the Court is, at its core, a breach of contract dispute.

As for the NJFTA claim, some of the badges are present in this case. The payments under the Plan were made to Defendants that maintain a close relationship with one another and the Debtor, it is questionable whether the Debtor received reasonably equivalent value from the defendant Corporations since it appears they were not providing as many new customers as promised, and, given the Debtor was in bankruptcy, the transfers were for a significant portion of the Debtor's assets. However, the payments that allegedly constitute fraudulent transfers were made in accordance with the Plan and Settlement Agreement—a court-approved contract. See Dkt. No. 130. While it is possible that the Defendants' interpretation of those contracts is incorrect, that does not rise to the level of fraud.

For these reasons, the Trustee's amendment is futile, and the Motion to Further Amend with respect to Counts III and IV is DENIED.

### 2. Conspiracy (Count I) and Piercing the Corporate Veil (Count VIII)

Because the Trustee has failed to sufficiently plead the fraud-based claims, the Conspiracy and Piercing the Corporate Veil claims must fail as well. There can be no conspiracy where there is no underlying wrongdoing—there can be no secret conspiracy if there was no intent to defraud.

Generally, limited liability under the corporate "veil" is only abrogated where the perpetrating party "has abused the privilege of incorporation by using the [corporate form] to perpetrate fraud or injustice, or otherwise circumvent the law." State, Dept of Environmental Protection v. Ventron Corp., 94 N.J. 473, 500, 468 A.2d 150, 164 (1983). As explained above,

14

the Trustee has not sufficiently pled a fraud, injustice, or circumvention of the law, and therefore the protections afforded by the corporate entity should not be pierced.

For these reasons, the Trustee's amendments to Count I and the addition of Count VIII are futile and the Motion to Further Amend as to these counts is DENIED.

### 3. Breach of Fiduciary Duty against NAMT, Cahill, Rosenberg, Giglio, Freedman, and Freund (Count II)

With respect to Freund and NAMT, this Court's May 14, 2015 Opinion addressed the Trustee's Breach of Fiduciary Duty Count and determined that it should not be dismissed under Rule 12(b)(6). As explained in the Opinion, there is a plausible basis for breach of fiduciary duty against those acting in their capacity as Disbursing Agents. Thus, this Count is still pending with respect to Freund and NAMT.

However, with respect to the added Defendants—Cahill, Rosenberg, Giglio, and Freedman—the Trustee has not sufficiently plead breach of fiduciary duty. This Count remains pending against Freund and NAMT because, as the Court reasoned, a disbursing agent might have a fiduciary duty to properly make payments to creditors under a confirmed plan, and the Trustee set forth a plausible claim that the Disbursing Agents had that duty. The remaining Individual Defendants, however, have never been alleged by the Trustee to have been acting as the disbursing agent in this case.

The Court acknowledges that, generally, "officers are fiduciaries of the corporations they serve." United Artists Theatre Co. v. Walton, 315 F.3d 217, 230 n. 14 (3d Cir. 2003). Such officers have a duty of loyalty to their corporation. Matter of Seidman, 37 F.3d 911, 933 (3d Cir. 1994). Officers cannot "manipulate the affairs of [their] corporation to their detriment and in disregard of the standards of common decency . . . [or] use [their] power for [their] personal

15

advantage and to the detriment of the stockholders and creditors . . . ." <u>Pepper v. Litton</u>, 308 U.S. 295, 311, 60 S. Ct. 238, 247 (1939).

The Second Amended Complaint adds no new significant facts. The Second Amended Complaint adds details that show some of the remaining Defendants may have had control over the Debtor's finances and thus, may have owed a fiduciary duty to the Debtor. But, even if these Defendants owed a fiduciary duty to the Debtor, the Trustee has failed to allege any facts that plausibly indicate Cahill, Rosenber, Giglio, or Freedman committed any wrongdoing in violation of that fiduciary duty. As explained above, the fraud-based conspiracy alleged by the Trustee has not been sufficiently plead and the Second Amended Complaint will not be permitted to include those claims. Without a plausible claim that a fraud or conspiracy occurred, all that remains is the general premise that the Disbursing Agents allegedly made overpayments under the Plan. Even if any of the remaining Defendants controlled the Debtor's finances, the Court has found no authority that officers can breach their fiduciary duty by turning funds over to a disbursing agent according to a confirmed plan. The Trustee has not alleged any facts that indicate that any of the non-disbursing agents did anything beyond allowing the Disbursing Agents to make payments; that those payments may have been improperly made is an issue for the Disbursing Agents, not for the other officers.

Thus, the Trustee still has not presented a plausible claim with respect to the remaining Defendants. The Trustee's Motion to Further Amend is DENIED insofar as it seeks to add additional Defendants Cahill, Freedman, Rosenberg, and Giglio to the Breach of Fiduciary Duty Count.

### 4. Breach of Contract Against NAMT, ICMG, and UBS (Count V) & Negligence Against NAMT and Freund (Count VI)

In accordance with this Court's Opinion dated May 14, 2015, the Trustee's Breach of Contract and Negligence Counts are still pending and the Trustee has not made any significant amendments to them in the Second Amended Complaint. Thus, these Counts will remain pending.

### 5. Conversion (Count VII)

Under New Jersey law, conversion requires the plaintiff to establish: "(1) the existence of property, (2) the right to immediate possession thereof belonging to the plaintiff, and (3) the wrongful interference with that right by [the] defendant." Corestar Intern. Pte. Ltd v. LPB Communications, Inc., 513 F. Supp. 2d 107, 127 (D.N.J. 2007). Though the Court has not uncovered directly applicable case law involving bankrupt debtors, there is New Jersey-based case law that stresses the importance of the second element—that the injured party has an immediate right to the allegedly converted property. See, e.g., Communications Programming, Inc. v. Summit Mfg., Inc., 1998 WL 329265 at *5 (D.N.J. Jun. 16, 1998).

The Trustee argues that the Defendants are liable for conversion as a result of their alleged scheme where, using their control over the Debtor's assets and concealing accurate records from creditors, the Defendants effectively transferred the Debtor's revenues to themselves rather than to creditors. However, the fact that the payments in question were made under an interpretation of the Plan and Settlement agreement in the Debtor's Chapter 11 case makes it impossible for the Trustee to prevail on a claim of conversion. First, the Debtor did not have the immediate right to possession of the funds transferred; if the funds were not properly transferred to the Corporate Defendants, then they belonged to other creditors. Moreover, as

explained above, the third element is lacking because no wrongdoing as been adequately pled by the Trustee.

For these reasons, the Trustee's Motion to Further Amend is DENIED with respect to Count VII.

### 6. RICO (Count IX)

Count IX is newly raised in the Second Amended Complaint. The Trustee argues that this Count should relate back to the filing date of the original Complaint under Rule 15(c). Under Rule 15(c)(1)(B), "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." The Rule requires fair notice to the parties, and relation back is acceptable where "a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide." Glover v. F.D.I.C., 698 F.3d 139, 146 (3d Cir. 2012).

Applying Rule 15(c) requires a "common core of operative facts in the two pleadings." In re Jamuna Real Estate, LLC, 460 B.R 661, 671 (Bankr. E.D. Pa. 2011). "When determining whether a common core of operative facts exists, the court looks at whether the opposing party has had fair notice of the general fact situation and legal theory upon which the amending party proceeds." Id. (citations omitted). For example, in Jamuna, the court found that newly-plead breach of fiduciary claims based on new facts could not relate back to a fraud-based complaint, even though they "[b]oth may have their genesis in the original scheme," because the operative facts supporting the two claims were distinct from one another. Id. at 672.

The Trustee argues that the Defendants had notice of all potential causes of action that could be raised against them from the facts set out in the Second Amended Complaint, which include the RICO claims. The Trustee relies on Bensel v. Allied Pilots Ass'n, 387 F.3d 298 (3d Cir. 2004) in support of his position. In Bensel, the court determined that additional breach of fair representation claims related back to a complaint that already consisted of breach of fair representation claims based on the same operative facts. Id. at 310. The court explained that the new claims were simply more particularized, and the defendant was "unquestionably on notice that it would be held liable for every possible breach of its fair representation duty occasioned by the outlined facts." Id.

The RICO claim in this case is an entirely new legal theory of which the Defendants were not given fair notice. The initial Complaint involved a dispute over payments made under the Plan by the Disbursing Agents. The Trustee made vague and insufficiently particularized fraud claims stemming from the general allegation that the Defendants conjured the Settlement Agreement and Plan to intentionally avoid paying third-party creditors. In amending the Complaint to assert a more plausible claim, the Trustee revealed new facts involving cramming, which make up the basis for his RICO claim. These facts are wholly unrelated to the initial issue before the Court of which the Defendants were noticed. The only remote relationship between Giglio's alleged cramming and the initial Complaint is the Trustee's assertion that the Defendants developed their scheme to overpay themselves via the Plan in order to hide their cramming scheme. The Court is not persuaded by this argument. The Trustee's RICO claim is an allegation that the Defendants defrauded pre-bankruptcy customers, and the initial Complaint strictly involved an entirely different scheme to defraud creditors in the bankruptcy case by misconstruing the Plan.

Accordingly, the RICO claim does not relate back, and the Trustee's Motion to Further Amend is DENIED to the extent it seeks to add this Count.

### B. Trustee's Motion for Entry of Default Judgment Against NAMT

The Trustee seeks default judgment against NAMT. NAMT has not responded in this matter. However, Freedman filed opposition to the Trustee's request in which he relied upon a nearly-150 year old Supreme Court decision, Frow v. De La Vega, 82 U.S. 552 (1872). In Frow, the Supreme Court cautioned against entering default judgment against one defendant when the complaint is still pending against other defendants. Id. The Supreme Court wanted to avoid the bizarre result that "there might be one decree of the court sustaining the charge of joint fraud committed by the defendants [via the default judgment]; and another decree disaffirming the said charge [following litigation against the other defendants]." Id. at 554. The Supreme Court did note, however, that even if default judgment should not be entered, the defaulting defendant loses standing to appear or procure evidence and is no longer entitled to notices in the case. Id.

However, the Frow decision preceded an amendment to Rule 54(b) that indicates that final judgments may be entered against one of multiple parties under certain circumstances. The Rule currently reads as follows:

> [W]hen multiple [claims or] parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b) (emphasis added). As the Second Circuit noted, "at most, <u>Frow</u> controls in

situations where the liability of one defendant necessarily depends upon the liability of the

others." <u>International Controls Corp. v. Vesco</u>, 535 F.2d 742, 746 n.4 (2d Cir. 1976).

     In response to Freedman's opposition, the Trustee argued that Freedman's potential

liability does not depend upon the liability of NAMT. The Trustee explained that "there is no

claim of liability against Freedman based upon his ownership of NAMT, nor is there any claim

Freedman is liable for NAMT's breaches of its contractual obligations[,] its fiduciary

obligations[,] or for its negligence." <u>See</u> Trustee Reply Letter, Doc. No. 99. The Trustee added

that there is no just reason for delay in entering default judgment against NAMT.

     <u>Frow</u> has been called into doubt by multiple courts, namely where a default judgment

against one defendant would not affect the liability of non-defaulting defendants. <u>See Colony</u>

<u>Nat'l Insurance Co. v. Control Building Services, Inc.</u> 2015 WL 7296034, at *5 (D.N.J. Nov. 18,

2015) (collecting cases). However, as noted in <u>Colony</u>, "courts have interpreted <u>Frow</u> to apply

only <u>when default judgment against one defendant creates the possibility of an inconsistent</u>

<u>ruling with respect to another defendant</u>." <u>Id.</u> (emphasis added) (collecting cases). Another

court has said the same:

> In a multiple-defendant case, default judgment against one
> defendant should be avoided if the default judgment could create
> 'inconsistent and unsupportable' results as to the non-defaulting
> defendants." Thus, "if default is entered against some defendants
> in a multi-defendant case, the preferred practice is for the court to
> withhold granting default judgment until the action is resolved on
> its merits against non-defaulting defendants: if plaintiff loses on
> merits, the complaint should then be dismissed against both
> defaulting and non-defaulting defendants."

<u>West American Ins. Co. v. Boyarski</u>, 2012 WL 4755372 at *2 (M.D. Pa. Oct. 5, 2012) (citations

omitted).

In another case in this District, the plaintiff filed suit against two related entities, Hilton

Worldwide and Hilton Holdings, and sought default judgment against the nonresponsive Hilton

Worldwide. Eteam, Inc. v. Hilton Worldwide Holdings, Inc., 2016 WL 54676, *2 (D.N.J. Jan. 5,

2016). The facts and allegations against both defendants were identical and there was no way to

determine precisely what the relationship between the two defendant entities might have been.

Id. Under those circumstances, the court refused to enter default judgment against only Hilton

Worldwide because doing so ran the risk of inconsistent judgments between the defendants

based on identical facts and allegations. Id. at *3.

Similar to the decision in Eteam, delaying entry of default judgment against NAMT is

appropriate because it would run the risk of inconsistent judgments. The Complaint contains

multiple counts against NAMT that are also being asserted against other defendants based on the

same facts. The Trustee has suggested that discovery, that would otherwise be difficult to obtain,

could be obtained from NAMT should a default judgment be entered. However, that possibility

is outweighed by the oddity that could result from conflicting judgments between NAMT and the

remaining parties. Moreover, the Trustee has already acknowledged that there have been

defaults entered against Giglio and ICMG, which have stripped those parties of their right to

answer any counts in the Second Amended Complaint. The same result should occur with

NAMT.

For these reasons, the Trustee's request to enter default judgment against NAMT is

DENIED at this time.


### C. Freund's Cross-Motion to Dismiss under Affidavit of Merit Statute

Freund argues that, since he is a CPA, the Trustee was required to comply with New

Jersey's affidavit of merit ("AOM") Statute, and because the Trustee did not provide Freund

with an AOM, the negligence count against Freund should be dismissed.  See N.J.S.A. 2A:53A-27.  The AOM Statute requires that the plaintiff provide the defendant with an AOM of an appropriately licensed person that the defendant deviated from the applicable professional standard of care.  N.J.S.A. 2A:53A-27.  Accountants are included in the definition of "licensed person."

However, the Trustee is not suing Freund in his capacity as a CPA; rather, the Trustee's claim asserts that Freund was negligent in his capacity as Disbursing Agent in the Chapter 11 case.  The Court is unaware of any authority holding that the AOM Statute applies to disbursing agents.  Freund has argued that, in essence, the Trustee is pursuing Freund in his capacity as an accountant because his duties as Disbursing Agent are akin to the duties of an accountant, including: ensuring payments were properly made in accordance with the Plan; accounting for all money received and paid by the Debtor; and overseeing the Debtor's finances.  Freund notes that an accountant is a professional who conducts bookkeeping and reviews and inspects financial reports.

The AOM Statute applies to claims that "require proof of a deviation from the professional standard of care for that specific profession."  Couri v. Gardner, 173 N.J. 328, 341, 801 A.2d 1134, 1141 (2002).  The mere fact that a claim is captioned, "negligence," is not dispositive; courts must analyze the nature of the proof required to prevail and the factual allegations involved.  Syndicate 1245 at Lloyd's v. Walnut Advisory Corp., 721 F. Supp. 2d 307, 315 (D.N.J. 2010).  An AOM is not required where the allegations do not require proof of a deviation from the applicable professional standard of care.  Id.  This concept is enveloped in the "common knowledge exception" to the AOM requirement.  See Bender v. Walgreen E. Co., 399 N.J. Super. 584, 590, 945 A.2d 120, 122 (App. Div. 2008).

23

The common knowledge exception applies where the fact-finder's ordinary understanding and experience is sufficient to determine the defendant's negligence without the assistance of an expert witness. Bender, 399 N.J. Super. at 590, 945 A.2d at 122. In other words, if the defendant's negligence is "readily apparent to anyone of average intelligence and ordinary experience," then the exception applies. 399 N.J. Super. at 590, 945 A.2d at 122. For example, the common knowledge exception has been applied where a pharmacist gave a customer the wrong prescription. 399 N.J. Super. at 591, 945 A.2d at 123.

A negligence claim against a disbursing agent in a Chapter 11 does not require proof of a deviation from a professional standard of care, and even if it did, the common knowledge exception would apply. There is no requirement in the Bankruptcy Code that a disbursing agent be an accountant. Freund was not necessarily serving as the Disbursing Agent because of his CPA credential; he was serving as the Disbursing Agent because of his role as a principal of the Debtor. It is common for an attorney, a principal of the Debtor, or a member of a creditors committee to be the disbursing agent under a Chapter 11 plan.[2] Considering lay people are often appointed as disbursing agents, a lay person could also understand whether a disbursing agent was negligent in his duty to collect funds from the Debtor and make payments to creditors. Thus, the Court finds that no expert testimony would be needed to determine whether Freund was negligent in his role as Disbursing Agent.

Accordingly, Freund's Motion to Dismiss is DENIED.

---

[2] Indeed, many Chapter 7 trustees are not accountants but make disbursements in a capacity akin to a disbursing agent.

24

## CONCLUSION

For the foregoing reasons, Freund's Motion to Dismiss and the Trustee's Motion for Entry of Default Judgment Against NAMT are both DENIED.  Moreover, because the only counts determined to not be futile are those that were already pending prior to the filing of the Second Amended Complaint, the Trustee's Motion to Further Amend is DENIED as well.

An Order reflecting this decision will be docketed by the Court.

Dated: November 7, 2016

JERROLD N. POSLUSNY, JR.
U.S. BANKRUPTCY COURT JUDGE